IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


MILLER CONSTRUCTION EQUIPMENT )
SALES, INC.,                   )
                               )
                 Plaintiff,    )
                               )
       vs.                     )
                               )
CLARK EQUIPMENT COMPANY, d/b/a )
DOOSAN INFRACORE CONSTRUCTION  )
EQUIPMENT OF AMERICA,          )
                               )    No. 1:15-cv-0007-HRH
                 Defendant.    )
_____)

O R D E R

Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment.[1]  This motion is opposed.[2]  Oral

argument was requested and has been heard.

Facts

Plaintiff is Miller Construction Equipment Sales, Inc.  Defendant is Clark Equipment

Company d/b/a Doosan Infracore Construction Equipment America.

Plaintiff was an authorized dealer of Doosan equipment from 2006 through 2014

pursuant to a series of agreements entered into on an annual basis.  The Sales Agreement

_____

[1]Docket No. 29.

[2]Docket No. 33.

precluded plaintiff from selling any products "which in the reasonable commercial judgment of DOOSAN" would compete with Doosan's products unless plaintiff was already selling those products "as of the Effective Date" of the Sales Agreement.[3]

In June 2013, plaintiff advised defendant that it was "looking in to the JCB line to coexist with our Doosan line" and that it would "not be bringing in any JCB products that compete directly with any products in the Doosan line."[4]  Plaintiff advised defendant that it was considering adding the JCB line of "mini" or "compact" equipment.[5]  Although defendant also owns the Bobcat equipment line, which manufactures and sells compact equipment, plaintiff was never a Bobcat dealer.  Brady Seavert, defendant's director of sales for the Western Region, advised Andrew Miller, plaintiff's general manager, that "[b]ased off your email I don't see a problem," but Seavert wanted to call Miller to discuss the issue.[6]  Andrew Miller avers that Seavert "never called to ask any additional questions and we

---

[3]Dealer Sales Agreement at 1, Section 2, Exhibit A, Andrew Miller Declaration [etc.,], Docket No. 31.  Defendant complains that much of Andrew Miller's declaration does not appear to be based on his personal knowledge but rather contains opinions about the proper interpretation of the contract and statutes at issue.  To the extent that Andrew Miller's declaration contains improper opinions, the court has not relied on those opinions.

[4]Email from Andrew Miller to Brady Seavert, Exhibit O, Andrew Miller Declaration, Docket No. 31.

[5]Id.

[6]Email from Brady Seavert to Andrew Miller, Exhibit O, Andrew Miller Declaration, Docket No. 31.

understood that to mean there was no problem."[7]   Andrew Miller avers that plaintiff signed an agreement with "JCB on October 29, 2013....."[8]   Miller further avers that while plaintiff was a Doosan dealer, it "only sold one piece of JCB equipment, an 8 ton Compact Excavator, that is competitive with one of Doosan's smaller excavators.  The particular customer specially ordered the equipment."[9]   Miller also avers that there are at least four other dealers in the United States "that represent both Doosan and JCB."[10]

The parties met on February 27, 2014, to discuss the 2014 Sales Agreement. Defendant contends that it was the parties' practice not to meet to negotiate a new sales agreement until after the prior sales agreement had expired on its own terms.  Seavert avers that "[f]ollowing the expiration date" of an annual sales agreement, "the parties' prior course of dealing was to continue doing business pursuant to the terms of the expired agreement while they negotiated and agreed to sales commitments and other elements of the Dealer Sales & Marketing Action Plan for the year."[11]

_____

[7]Andrew Miller Declaration at 6, ¶ 31, Docket No. 31.

[8]Id. at ¶ 33.

[9]Id. at 7, ¶ 36.

[10]Id. at ¶ 41.

[11]Affidavit of Brady Seavert at 23, ¶ 47, Docket No. 34.  Plaintiff complains that much of Seavert's affidavit is based on speculation unsupported by any factual evidence.  What plaintiff really seems to be arguing is that its view of the "facts" is correct and that Seavert's is incorrect, but that is not an issue that can be resolved on motion for summary judgment.

Andrew Miller avers that defendant did not "raise[] any issue about [plaintiff] representing JCB" at the February 27, 2014 meeting.[12]   Seavert, however, avers that he "raised the issue that customers had reported that [plaintiff] could sell the JCB® line of heavy equipment."[13]  Seavert further avers that Andrew Miller "assured [Seavert] that [plaintiff] was not stocking JCB® heavy equipment comparable to or competitive with any of the Doosan® products for which [plaintiff] was an authorized dealer."[14]  Seavert further avers that Andrew "Miller stated that [plaintiff] had the contractual right to sell JCB® heavy equipment if a customer specifically requested it but led me to believe that [plaintiff] would devote 'best efforts' to the Doosan® product line notwithstanding the fact that [plaintiff] had become a JCB® dealer in the fall of 2013."[15]

The parties reached an agreement as to a sales contract for 2014 at the February 27, 2014 meeting.  The 2014 Sales Agreement had an effective date of January 1, 2014 and expired by its own terms on December 31, 2014.[16]  The 2014 Sales Agreement assigned the following "areas of primary responsibility (APR) to plaintiff: "Anchorage Municipality,

---

[12]Andrew Miller Declaration at 6, ¶ 32, Docket No. 31.

[13]Seavert Affidavit at 5, ¶ 6, Docket No. 34.

[14]Id. at 6, ¶ 8.

[15]Id.

[16]Dealer Sales Agreement at 5, Section 17, Exhibit A, Andrew Miller Declaration, Docket No. 31.

Bristol Bay Borough, Haines, Juneau, Kenai Peninsula Borough, Ketchikan Gateway, Kodiak Island Borough, Lake and Peninsula Borough, Matanuska-Susitna Borough, Prince of Wales-Outer Ketchikan, Sitka, Skagway-Yakutat-Angoon, Valdez Cordova Borough and Wrangell-Petersburg."[17]

Section 3 of the 2014 Sales Agreement was entitled "Use of Trademarks."[18] Section 3.1 provided that "[d]uring the term of this Agreement (and during such term only), DEALER may indicate on its letterhead, on signs, on service trucks, and in connection with its use of any other methods of identifying itself to the public, that DEALER is an authorized DEALER in PRODUCTS and PARTS merchandised by DOOSAN."[19]

Section 5 of the 2014 Sales Agreement was entitled "Sales and Service Responsibility."[20] Section 5.I provided that

> [b]ecause of the importance to the sales of PRODUCTS and PARTS and customer goodwill of timely and adequate performance of sales and service responsibilities outlined in this Section 5 and because of the absence of any means to assure that such responsibilities are properly performed with respect to sales and leases abroad, it shall be a breach of this Agreement for DEALER to sell or lease any new PRODUCT ("new PRODUCT" for the purposes of Section 5.I is defined as

---

[17]Id. at 1, Section 2.

[18]Id. at Section 3.

[19]Id. at Section 3.1.

[20]Id. at Section 5.

any PRODUCT that has less than 300 hours of operation and for which less than twelve months have elapsed since the PRODUCT was first used by an end user in actual commercial use or first placed into DEALER's rental fleet) ... exclusively used in any country other than that in which the DEALER's above identified place of business is located.[21]

Section 5.K provides that "DEALER will not advertise prices for new PRODUCTS (PRODUCTS with less than 300 hours of operation and for which less than six months have elapsed since the PRODUCT was first used by an end user in actual commercial use or first placed into DEALER's rental fleet) and PARTS on an internet site ... except as otherwise agreed to by DOOSAN in writing."[22]

Section 6 of the 2014 Sales Agreement provided that plaintiff was to

use its best efforts to promote the sale of and sell PRODUCTS and PARTS within its APR ... and ... maintain a level of sales of PRODUCTS and PARTS satisfactory to DOOSAN. In determining whether DEALER's level of sales has been satisfactory during any period, DOOSAN may consider DEALER's performance in meeting DEALER's volume and market penetration commitments for sales of PRODUCTS and PARTS as established from time to time jointly by DEALER and DOOSAN including those set forth in the Dealer Sales & Marketing Action Plan. DEALER will maintain a suitable place of business and an adequate stock of PRODUCTS and PARTS, and solicit all actual and potential customers within its APR ... or trade area as described in the Dealer Sales and Marketing

---

[21]Id. at 3, Section 5.I.

[22]Id. at 3, Section 5.K.

Action Plan regularly and frequently.[23]

Section 19.2 of the 2014 Sales Agreement provided that "DOOSAN may terminate the Agreement by giving DEALER not less than ninety (90) days prior written notice of termination" if the Dealer failed "to maintain a level of sales of PRODUCTS and PARTS or to perform in accordance with the Dealer Sales and Marketing Action Plan as provided in Section 6" or if the Dealer failed "to perform any of the promises given or obligations undertaken in th[e] Agreement[.]"[24] Section 19.2 also provided that if any of the failures can be cured, defendant was to give the dealer "sixty (60) days ... to effect such cure.[25]

Section 20.2 of the 2014 Sales Agreement provided:

> Upon termination of this Agreement, DOOSAN shall repurchase at DEALER's net cost, and DEALER shall sell, all of DEALER's inventory of new and unused PRODUCTS and PARTS not previously sold or rented by DEALER which are in good and usable condition and not obsolete. New PRODUCTS more than twelve (12) months old shall be considered obsolete. DOOSAN shall have the option, but no obligation, to repurchase other PRODUCTS of DOOSAN at fair wholesale market value. There shall be deducted from the repurchase price a charge to cover handling, freight and restocking equal to at least ten percent (10%) of the repurchase price.[26]

---

[23]Id. at 4.

[24]Id. at 6, Section 19.2.

[25]Id.

[26]Id. at 6, Section 20.2.

During 2014, plaintiff forecasted that it would sell 7 HEX units, 5 WL units, and 2 ADT units.[27] Plaintiff actually "sold or placed into its rental fleet eight HEX units, ... five WL units, and no ADT units."[28]

During 2014, plaintiff also committed to "stock a minimum of 3 new LX and 3 new WL at all times", "to improve [its] stock order ratio to 60% by Dec. 15, 2014[,]" to increase [its] dealer evaluation score to great[er] than 75% overall by the end of the 2nd Qtr 2014[,]" and to "identify 2 high profile customers in [its] territory that use competitive equipment in the construction market ... and develop a plan on how to gain th[ose] customers['] business."[29] Defendant contends that plaintiff failed to accomplish any of these commit-ments.[30]

Andrew Miller avers that during 2014, "Doosan never raised any issue ... about [plaintiff's] sales performance...."[31] Seavert, however, avers that at plaintiff's mid-year review on August 5, 2014, "Doosan raised a number of issues regarding [plaintiff's] performance" including plaintiff's "failure to pay its bills, it lack of demonstrated

---

[27]Dealer's Sales & Marketing Action Plan, attached to 2014 Dealer Sales Agreement, Exhibit A, Andrew Miller Declaration, Docket No. 31.

[28]Andrew Miller Declaration at 8, ¶ 43, Docket No. 31.

[29]Dealer Action Items, attached to 2014 Dealer Sales Agreement, Exhibit A, Andrew Miller Declaration, Docket No. 31.

[30]Seavert Affidavit at 7, ¶ 11, Docket No. 34.

[31]Andrew Miller Declaration at 7, ¶ 40, Docket No. 31.

commitment to the Doosan® product line, and its lack of an adequate facility in Wasilla."[32] Seavert avers that nonetheless the meeting "ended on a positive note[,]" but shortly thereafter, plaintiff "stopped purchasing Doosan® equipment altogether. Doosan's records show that [plaintiff's] last purchase of Doosan® equipment took place on August 20, 2014."[33] Miller avers that this "was not unusual" because plaintiff "for business reasons does not typically increase its inventory during the last quarter of the year."[34]

In a September 3, 2014 press release, JCB announced that plaintiff had become a JCB dealership. The press release stated that "[t]hree JCB-dedicated salespersons and seven service technicians will ensure customers receive knowledgeable and one-on-one attention at each location."[35] Seavert avers that he did not become aware of this press release "until after this litigation was underway."[36]

In 2014, Craig Taylor Equipment (CTE), which is headquartered in Fairbanks, Alaska, but also has locations in Anchorage, Wasilla, and Soldotna, became a Doosan dealer. Plaintiff contends that defendant was allowing CTE to carry and promote Doosan products at locations within plaintiff's APR. Defendant contends that CTE was only

---

[32]Seavert Affidavit at 10, ¶ 14, Docket No. 34.

[33]Id. at ¶¶ 14-15.

[34]Andrew Miller Declaration at 8, ¶¶ 45-46, Docket No. 31.

[35]Exhibit C at 1, Seavert Affidavit, Docket No. 34.

[36]Seavert Affidavit at 11, ¶ 17, Docket No. 34.

authorized to sell Doosan products in areas outside of plaintiff's APR, but that CTE was

allowed to purchase Doosan equipment for rental in plaintiff's APR pursuant to Doosan's

National Accounts Policy.[37]  Seavert avers that plaintiff "received in excess of $100,000" in

commissions as a results of these sales.[38]

Andrew Miller avers that

> [t]hroughout 2014 [plaintiff] complained to Doosan about
> CTE's activities in its APR.  This led to a significant deteriora-
> tion in the relationship between [plaintiff] and [defendant].  As
> the end of 2014 approached, [defendant] became less and less
> responsive to [plaintiff's] needs.  Unlike prior years, [defen-
> dant] never scheduled a year end meeting to discuss [plain-
> tiff's] 2015 forecasts for its operations.  It cancelled [plaintiff's]
> invitation to attend the annual dealer's meeting based on a
> prextext that [plaintiff] was not current on its account despite
> the fact that [plaintiff] was current under its agreement with
> Doosan's receivable department.[[39]]

Seavert avers however that in early 2015, he "was trying to meet with [plaintiff] to

reach an agreement on [plaintiff's] Dealer Sales Agreement Commitments for 2015 so that

the parties could execute a new Doosan® DSA for 2015."[40]  Seavert avers that a meeting

was "scheduled for March 13, 2015 – but was postponed repeatedly and ultimately never

---

[37]Id. at 9, ¶ 13.

[38]Id.

[39]Andrew Miller Declaration at 2, ¶ 7, Docket No. 31.

[40]Seavert Declaration at 12, ¶ 19, Docket No. 34.

rescheduled because of various actions by [plaintiff's] attorney. Rather than meet, [plaintiff] and its counsel took the position that Doosan had 'constructively terminated' its Doosan® dealership in 2014...."[41]

On March 23, 2015, Andrew Miller advised Seavert that plaintiff had concluded "that Doosan has terminated our agreement" and that plaintiff "was treating this termination as having an effective date as of the date of this letter for the purpose of the Alaska statute covering your termination of our Agreement."[42]

Seavert responded that "Doosan has not terminated your dealership or made a decision regarding such termination" and that "[a]lthough we would welcome receipt of information regarding the amounts you would be seeking from Doosan in the event of a termination, we reject your attempt to characterize our discussions to date as constituting a termination of your dealership."[43] Seavert further advised that defendant "remain[ed] willing to discuss the terms of a mutually agreed upon voluntary termination with" plaintiff.[44]

---

[41]Id.

[42]Letter from Andrew Miller to Brady Seavert at 1, Exhibit C, Andrew Miller Declaration, Docket No. 31.

[43]Letter from Brady Seavert to Andrew Miller, Exhibit D, Andrew Miller Declaration, Docket No. 31.

[44]Id.

Andrew Miller responded that "[w]e disagree with your characterization of the facts surrounding Doosan's decision to not renew our Dealer Sales Agreement" and that plaintiff would "continue to proceed as set forth" in Miller's March 23, 2015 letter.[45]  Miller asked that plaintiff be provided with the "information about where you want us to ship the equipment you are obligated to repurchase."[46]

Seavert again responded that "Doosan has not terminated your dealership or made a decision regarding such termination...."[47]  Seavert advised that "Doosan is not willing to proceed in accordance with your letter and to provide you with instructions as to where to ship equipment."[48]  But, Seavert stated that if plaintiff "want[ed] to proceed with discussions regarding a mutual voluntary termination, we again request that you promptly advise us with a statement of the amount for which you would be seeking reimbursement from Doosan."[49]

On April 6, 2015, Andrew Miller sent Seavert the list of equipment that plaintiff

---

[45]Letter from Andrew Miller to Brady Seavert, Exhibit E, Andrew Miller Declaration, Docket No. 31.

[46]Id.

[47]Letter from Brady Seavert to Andrew Miller, Exhibit F, Andrew Miller Declaration, Docket No. 31.

[48]Id.

[49]Id.

believed defendant had an obligation to buy back.[50]  The list contained eight pieces of equipment and some stock attachments.[51]  On April 13, 2015, Seavert responded that "Doosan would be willing to repurchase this equipment at the buyback prices you have listed, subject to an inspection of the machines to confirm their condition."[52]  Seavert advised however that "[t]he repurchase of the equipment ... would be conditioned on Miller Equipment providing a mutually acceptable release of any other claims against Doosan with respect to the proposed termination of your dealership."[53]

On May 6, 2015, defendant advised plaintiff "that Doosan wishes to proceed with a 2015 Dealer Sales Agreement and 2015 Dealer Commitments."[54]  Defendant further advised plaintiff that "[u]ntil the 2015 Dealer Sales Agreement and 2015 Dealer Commitments are signed, Doosan expects Miller Equipment to continue to perform its obligations as a Doosan dealer.  In order to eliminate any further doubt about Miller Equipment's

---

[50]Exhibit H, Andrew Miller Declaration, Docket No. 31.

[51]Id. at 3.

[52]Letter from Seavert to Andrew Miller, Exhibit I, Andrew Miller Declaration, Docket No. 31.

[53]Id.

[54]Letter from James M. Plasynski to Garth Schlemlein at 1, Exhibit J, Andrew Miller Declaration, Docket No. 31.

status, Doosan again confirms that Miller Equipment remains a Doosan dealer."[55]

On May 15, 2015, defendant sent plaintiff a letter confirming "Doosan's understanding that Miller Construction Equipment through its actions and statements has no intention of continuing as a Doosan dealer and therefore, Doosan accepts Miller's resignation."[56] The actions and statements to which defendant referred were that 1) "Miller has failed to sign the 2015 Dealer Sales Agreement", 2) "Miller ... has not promoted Doosan products", and 3) Miller's actions and claims regarding alleged termination ... are completely inconsistent with our annual renewal practice and Doosan's repeated statements and assurances to the contrary[.]"[57] Defendant advised that "[b]ased on Miller's decision to discontinue representing Doosan's products, Doosan will comply with its obligations under Alaska Statute Section 45.45.710."[58]

On May 25, 2015, plaintiff "submitted a request to the company [plaintiff] uses for internet consulting, requesting that references to Doosan be removed from all [plaintiff's] internet sites."[59]  Andrew Miller avers that plaintiff "also began the process of removing

---

[55]Id.

[56]Letter from James M. Plasynski to Garth Schlemlein at 1, Exhibit K, Andrew Miller Declaration, Docket No. 31.

[57]Id.

[58]Id. at 2.

[59]Andrew Miller Declaration at 9, ¶ 49 and Exhibit R thereto, Docket No. 31.

all signs and references to Doosan from its business locations" and that "[a]ll Doosan physical sign material was removed by the end of June 2015."[60]

On June 8, 2015, Seavert inspected the three pieces of equipment that plaintiff was now asking defendant to buy back: 1) DX140LCR-US20, 2) DL200TC-3-US10, and 3) DL250-3-US10. Andrew Miller avers that Seavert stated that all three pieces of equipment "looked fine and 'just needed a bath'" and that defendant would "get back to [plaintiff] within the week."[61] In addition to the three pieces of equipment, plaintiff also requested that defendant buy back some stock attachments and a shoe assembly track.[62] Miller avers that Seavert said it was "unnecessary" to inspect the attachments and "'not to worry about it.'"[63] Seavert avers that his "inspection, as documented at the time by notes and photographs, revealed that none of [plaintiff's] inventory of Doosan® equipment qualified for repurchase because none of it was 'new' or 'unused[.]'"[64]

Seavert's notes show that the DX140LCR-US20 unit had 294.9 hours of use, had "been on a few short term rentals to Bkrnell Const.", and that the "machine and work group looks like it has more than 300 hrs (Looks used). Inside of cab is extremely dirty.

---

[60]Id. at ¶ 50.

[61]Id. at 5, ¶ 26.

[62]Exhibit L, Andrew Miller Declaration, Docket No. 31.

[63]Andrew Miller Declaration at 5, ¶ 26, Docket No. 31.

[64]Seavert Declaration at 13, ¶ 22, Docket No. 34.

Attachments are beat up but working condition.  Very noticeable under carriage wear. Minor damages."[65]  Seavert's notes show that the DL2000TC-3-US10 unit had 216.9 hours of use, that it had been "used for 2014 snow rental season", had been "demoed to Armstrong", and that the "unit is in very good condition, needs a good cleaning.  No excessive tire wear, missing radio, clean cab.  Attachments show normal wear & tear – need repainting."[66]  Seavert's notes for the DL250-3-US10 unit shows that it had 169.9 hours of use, that it had been a "snow rental to AIH", had "no demos", and that the machine was "in very good shape – needs a good cleaning.  Attachments show use with rusting & wear, plus scratches on coupler.  No physical damages or tire wear.  ... Pallets forks ... show normal wear & weathering."[67]

On June 19, 2015, plaintiff asked its internet consultant to take down plaintiff's website completely because "[t]here is still reference to us as a Doosan dealer on it, and this is unacceptable."[68]

On May 14, 2015, plaintiff commenced this action in state court.  The matter was subsequently removed to this court.  In its complaint, plaintiff asserts five claims for relief.

---

[65]Exhibit F at 1, Seavert Affidavit, Docket No. 34.

[66]Id. at 2.

[67]Exhibit F at 3, Seavert Affidavit, Docket No. 34.

[68]Exhibit R, Andrew Miller Declaration, Docket No. 31.

Plaintiff's first claim for relief is a claim for the repurchase of equipment brought pursuant to AS 45.45.710. Plaintiff's second claim for relief is a claim for the payment for the value of business, brought pursuant to AS 45.45.740. Plaintiff's third claim for relief is a claim for the payment of expenses, also brought pursuant to AS 45.45.740. Plaintiff's fourth claim for relief is a claim that the 2014 Sales Agreement contains invalid provisions. Plaintiff's fifth claim for relief is a claim for a determination of overcharges.

Defendant has asserted four counterclaims against plaintiff. In Count One, defendant asserts a breach of contract claim and a breach of the implied covenant of good faith and fair dealing claim. In Count Two, defendant asserts Lanham Act unfair competition and trademark infringement claims. In Count Three, defendant asserts a claim under Alaska's Unfair Trade Practices and Consumers Protection Act. In Count Four, defendant asserts a claim for monies owed under the 2014 Sales Agreement.

Plaintiff now moves for summary judgment on its first claim for relief and on defendant's counterclaims in Counts One, Two, and Three.

<u>Discussion</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the moving party meets

its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. Id. at 255. "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

Plaintiff's First Claim for Relief

In its first claim for relief, plaintiff seeks to recover the monies it claims it is due under AS 45.45.710, which provides in pertinent part:

> If a dealer maintains a stock of merchandise supplied for the dealer's resale under a distributorship agreement and if the distributor or the dealer terminates the distributorship agreement, the distributor shall, unless the dealer chooses to keep the merchandise, pay the dealer for the merchandise that was purchased from the distributor and that is held by the dealer on the date of the termination an amount equal to

> (1) the fair market value for merchandise that is unused and for which the retailer has paid the distributor, plus 100 percent of the transportation charges paid by the dealer to return the merchandise to the distributor; in this paragraph,

> (A) "fair market value" means the amount the distribu-

tor would realize from the sale of the merchandise to
another retailer using reasonable good faith efforts;

(B) "unused" means unopened merchandise that is still
in the original factory packaging or container[.]

Plaintiff argues that for purposes of this statute "unused" means equipment that has less than 300 hours of use. Because the three pieces of equipment in question all had less than 300 hours of use, plaintiff argues that defendant was required to buy them back, as well as the unused stock attachments and shoe assembly track, which plaintiff contends are in their original packaging. Although plaintiff acknowledges that the statute provides that "unused" means merchandise that is still in its original packaging, plaintiff urges the court to ignore this definition when considering a buy back obligation involving heavy equipment. First, plaintiff contends that pieces of heavy equipment are not delivered to dealers in any particular "packaging" but rather arrive with little or no packaging. Second, plaintiff argues that the Sales Agreement expressly provides that equipment with less than 300 hours is considered "new" equipment, which is consistent with the custom in the heavy equipment industry. And third, plaintiff argues that the court is to interpret the statute "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters." Native Village of Elim v. State, 990 P.2d 1, 5 (Alaska 1999). Plaintiff contends that AS 45.45.710 was designed to protect local Alaska companies from large manufacturers like defendant in situations

just like that presented by this case and thus the statute's definition of "unused" can be ignored in this case.

AS 45.45.710 only requires defendant to buy back "unused" equipment, which is defined as merchandise still in its original factory packaging or container. There is no dispute that the three pieces of equipment were never in any packaging. The Alaska Supreme Court has never considered how to apply AS 45.45.710 in such situations. "'When the state's highest court has not squarely addressed an issue, [the court] must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treaties and restatements for guidance.'" First Intercontinental Bank v. Ahn, 798 F.3d 1149, 1157 (9th Cir. 2015) (quoting Glendale Assocs., Ltd. v. Nat'l Labor Relations Bd., 347 F.3d 1145, 1154 (9th Cir. 2003)).

The court predicts that the Alaska Supreme Court would interpret "unused" in situations where the merchandise was never in any packaging to mean merchandise that has not been commercially used. Such an interpretation is consistent with the plain meaning of the term "unused" and it is consistent with the purpose of the statute. There is nothing in the statute that suggests that the Alaska legislature intended that a distributor would be required to buy back equipment that had been commercially used. Nothing in the Sales Agreement requires a different result. Plaintiff's first claim for relief is not based

on the Sales Agreement, but rather is based solely on AS 45.45.710.[69]  But to the extent that plaintiff is relying on the Sales Agreement to support its contention that the industry standard of "unused" is any equipment with less than 300 hours, industry standard does not govern the interpretation of the statute.  Moreover, the buy back provision in the Sales Agreement provides that defendant will only buy back equipment "not previously sold or rented by Dealer...."[70]

The interpretation of "unused" to not include equipment that has been commercially used is also consistent with how other courts have interpreted their states' dealer statutes. For example, in <u>Terex Corp. v. Southern Track & Pump, Inc.</u>, 117 A.3d 537, 539-40 (Del. 2015), Southern Track wanted Terex to repurchase all of the inventory it had purchased from Terex after Southern Track terminated its dealership agreement with Terex, both the new and unused equipment and the equipment that was in Southern Track's rental fleet that had less than 300 hours of use.  The Delaware Dealer Statute, which is similar to AS 45.45.710, provided, in pertinent part:

> (a) The supplier shall repurchase from the dealer within 90 days after termination of the contract agreement all inventory

---

[69] At oral argument, plaintiff's counsel stated that plaintiff was not relying solely on AS 45.45.710 but was also relying on the buy back provision in the Sales Agreement. However, plaintiff's complaint does not allege any claim based on the buy back provision of the Sales Agreement.

[70] Dealer Sales Agreement at 6, ¶ 20.2, Exhibit A, Andrew Miller Declaration, Docket No. 31.

> previously purchased from the supplier that remains unsold
> on the date of termination of the agreement.
>
> (b) The supplier shall pay the dealer:
>
> (1) One hundred percent of the net cost of all new, unused,
> undamaged and complete inventory except repair parts, less
> a reasonable allowance for deterioration attributable to
> weather conditions at the dealer's location.

6 Del. C. § 2723. Southern Track relied on subsection (a) and argued that "all inventory"
meant all of the Terex equipment it still had. Terex relied on subsection (b) and argued that
it was only required to buy back "new, unused, undamaged, and complete" equipment,
which meant it would not have to buy back the rental equipment. Terex Corp., 117 A.3d
at 540. The Supreme Court of Delaware adopted Terex's interpretation of the statute
because it was "consistent with the statutory scheme, the canon of avoiding unnecessary
statutory gap-filling, and our preference to avoid interpretations that could invite
constitutional entanglements." Id. at 545. The court explained that the statute was "silent
on the price for inventory that is not 'new, unused, undamaged and complete'" and that
"[v]iewing the Dealer Statute as a whole suggests that the legislature was intentionally
silent." Id.

> For example, [the statute] provides allowances for "weather
> conditions at the dealer's location," stipulates the price reduc-
> tion available for suppliers who perform "the handling,
> packing and loading of repair parts," and states that "inven-
> tory shall be returned FOB to the dealership." A requirement
> that used equipment must also be repurchased would be a

matter of fundamental significance in this statutory scheme.

Id. at 546 (footnotes omitted). The court found that the legislature could be presumed to have been aware that in the heavy equipment industry dealers often place equipment into their rental fleets and thus could have included a formula for pricing equipment that was not new or unused and "[t]hat they chose not to suggests that we should decline to supply the alleged omission." Id. In its discussion, the court did note that "[c]ertain states expressly address equipment that was used by the dealer or used for demonstration purposes" and that "[s]everal states have dealer statutes that explicitly discuss equipment that has been leased or rented." Id. at 544, n.25 & n.26.

But, Alaska's statute does not do either of these things. It provides that the distributor shall buy back merchandise that the dealer has at the time of termination and it provides a pricing formula for "unused" equipment, which the statute expressly defines as equipment in its original packaging. This is an indication that the Alaska Legislature intended the buy back provision to apply to equipment that was new and that had not been commercially used.

In sum, for purposes of AS 45.45.710, defendant is only required to buy back merchandise that is in its original packaging, or if the merchandise was never in packaging, merchandise that was never commercially used. There can be no dispute that the three pieces of equipment had been commercially used. In the notes that Seavert made during

the inspection of the equipment, he noted that each piece of equipment had been rented out.[71] Although Andrew Miller tries to downplay the use that was made of this equipment in his declaration by stating that two of the pieces were used only for "minor demonstrations",[72] these "minor demonstrations" resulted in the equipment being commercially used. As for the stock attachments and shoe assembly track, plaintiff contends that these are still in the original packaging and plaintiff has submitted pictures to support this contention. While the pictures do show that some merchandise is in what appears to be original packaging, it is not clear to the court exactly what merchandise is reflected in the pictures. What is clear is that at least some of this merchandise falls within the statutory definition of "unused", which triggers defendant's obligation to buy back the merchandise.

Plaintiff's motion for summary judgment as to its first claim for relief is denied in part and granted in part. It is denied as to the three pieces of equipment that were rented out but it is granted as to the stock attachments and the shoe assembly track to the extent that this merchandise is either still in its original packaging or has not been used commercially.

Counterclaim Count One

In Count One of its counterclaims, defendant asserts breach of contract claims and

---

[71]Exhibit F, Seavert Declaration, Docket No. 34.

[72]Andrew Miller Declaration at 5, ¶ 29, Docket No. 31.

a breach of the implied covenant of good faith and fair dealing claim. Plaintiff's arguments are directed only toward the breach of contract claims, but if those claims fail, then the breach of the implied covenant claim would fail as well because this claim is based on the same allegations as defendant's breach of contract claim.[73] See, e.g., Rossetti v. Ambulatory Surgery Center of Brooklyn, LLC, 125 A.D.3d 548, 549 (N.Y.A.D. 1 Dep't 2015) ("The causes of action alleging breach of the implied covenant of good faith and fair dealing and conversion are based on the same allegations as underlie the breach of contract claims and should be dismissed as duplicative").

As an initial matter, plaintiff argues that defendant's breach of contract claims fail because the Sales Agreement is a contract of adhesion and thus cannot be enforced against it. "'Adhesion contract' is a handy shorthand descriptive of standard form printed contracts prepared by one party and submitted to the other on a 'take-it-or-leave-it' basis. The law has recognized there is often no true equality of bargaining power in such contracts and has accommodated that reality in construing them." Burgess Const. Co. v. State, 614 P.2d 1380, 1383 (Alaska 1980) (citation omitted). "Judicial recognition of adhesion contracts has generally been limited to consumer transactions in which form contracts are offered to the public on a mass basis." Id. at 1383-84.

---

[73]Answer, Affirmative Defenses and Counterclaims at 35, ¶ 19, Docket No. 5.

The Sales Agreement was not a contract of adhesion. Plaintiff had the opportunity to negotiate and modify the terms of the Sales Agreement as reflected in the addendums that were attached to the Agreement.

Plaintiff next argues that it did not breach either Section 2 or Section 6 of the 2014 Sales Agreement. Section 2 provides in pertinent part that

> [i]f during the term of this Agreement, DEALER stocks, sells or offers to sell any new products which in the reasonable commercial judgment of DOOSAN compete with PRODUCTS (other than competitive products which DEALER already sells as of the Effective Date of this Agreement), the APR set forth above, may in DOOSAN's sole discretion, be eliminated effective immediately upon DOOSAN providing written notice to DEALER of such elimination.[74]

Defendant alleges that plaintiff breached Section 2 by selling JCB equipment during 2014.

Section 6 of the Sales Agreement primarily requires the dealer to use its best efforts to sell and promote Doosan products.[75] Defendant contends plaintiff breached Section 6 by agreeing to sell JCB equipment, by failing to sell any articulated dump trucks in any year and any wheel loaders except for one year, by having inadequate capitalization and credit and substandard facilities, by the lack of any suitable facility in the state's largest metropolitan area, and by having an inadequate inventory of Doosan equipment.

---

[74]Dealer Sales Agreement at 1, Section 2, Exhibit A, Andrew Miller Declaration, Docket No. 31.

[75]Id. at 4, Section 6.

Even if plaintiff breached Section 2 and/or Section 6 of the Sales Agreement, defendant's breach of contract claims would still fail. The Sales Agreement contained a notice and cure provision in Section 19.2. Section 19.2 provides that if a dealer breaches Section 6 or fails to perform any of "the promises given or obligations undertaken in th[e] Agreement" and the breach or failure can be cured, defendant must give the dealer 60 days in which to effect a cure.[76] "Courts have recognized that where a contract expressly includes a notice and cure provision, a party failing to provide such is precluded from then subsequently suing the other party for breaching the agreement." Chrysler Realty Co., LLC v. Design Forum Architects, Inc., 544 F. Supp. 2d 609, 616 (E.D. Mich. 2008). Defendant did not give plaintiff an opportunity to cure any of the alleged breaches of Section 2 or Section 6, all of which would have been curable.

Defendant's argument that it could not have given plaintiff an opportunity to cure two of the alleged breaches of contract, namely the selling of competing JCB equipment and becoming a JCB-dedicated full line dealer, is unavailing. Defendant contends that it did not know about these breaches until after plaintiff voluntarily resigned as a Doosan dealer. However, the evidence shows that defendant knew that plaintiff was contemplating selling JCB equipment as early as June 2013 and that by the February 2014 meeting, defendant knew that plaintiff was selling JCB equipment. Defendant also contends that it

---

[76]Id. at 6, Section 19.2.

brought up some of the alleged breaches at the parties' August 2014 meeting and thus it gave plaintiff notice. But, defendant offers no evidence that suggests that it told plaintiff at that meeting that it had 60 days in which to cure the alleged breaches. Seavert avers that the parties discussed and reached some agreement as to the Wasilla facility and plaintiff's APR, but Seavert does not aver that plaintiff was given notice that it had 60 days in which to cure the alleged performance deficiencies.[77] Because there is no evidence that defendant gave plaintiff an opportunity to cure the alleged breaches, defendant is precluded from bringing breach of contract claims against plaintiff. Plaintiff's motion for summary judgment as to Count One of defendant's counterclaim is granted.

Counterclaim Count Two

In Count Two, defendant asserts Lanham Act trademark infringement and unfair competition claims. The 2014 Sales Agreement gave plaintiff the right to use the Doosan marks to indicate to the public that it was an authorized Doosan dealer, but plaintiff's right to use the Doosan marks in this manner was limited to the term of the Sales Agreement.[78]

Defendant's trademark claims are based on allegations that plaintiff continued to use the Doosan marks after it had voluntarily resigned as an authorized dealer of Doosan products. Defendant alleges that plaintiff used the Doosan marks to identify its dealership

[77]Seavert Affidavit at 11, ¶ 14, Docket No. 34.

[78]Dealer Sales Agreement at 1, Section 3, Exhibit A, Andrew Miller Declaration, Docket No. 31.

and to claim that it was an authorized Doosan dealer. Defendant alleges that plaintiff had the Doosan marks on its website and on its building and sign for a period of time after the 2014 Sales Agreement expired. Defendant supports this allegation with Seavert's declaration, in which he avers that plaintiff was still holding itself out as an authorized Doosan dealer on June 8 and 9, 2015.[79]

"'Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical: is there a likelihood of confusion?'" Amer. Circuit Breaker Corp. v. Oregon Breakers Inc., 406 F.3d 577, 584 (9th Cir. 2005) (quoting New West Corp. v. NYM Co., 595 F.2d 1194, 1201 (9th Cir. 1979)). In other words, in order to prevail on its claims in Count Two, defendant must prove that plaintiff's use of the Doosan marks after it was no longer authorized to use them was "likely to cause confusion" or "misrepresent[ed] the characteristics of" plaintiff's "goods or services." Freecycle Network, Inc. v. Oey, 505 F.3d 898, 902 (9th Cir. 2007).

Defendant seeks both injunctive relief and damages for its trademark claims. Plaintiff first argues that defendant is not entitled to injunctive relief. "To obtain a preliminary injunction," defendant "'must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'"

---

[79]Seavert Declaration at 30, ¶¶ 62 & 65, Docket No. 34.

Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc., 736 F.3d 1239, 1247 (9th Cir. 2013) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). The standard for a permanent injunction is the same with the exception that defendant must have actually succeeded on the merits. Flexible Lifeline Systems, Inc. v. Precision Lift, Inc., 654 F.3d 989, 996 (9th Cir. 2011).

The parties agree that plaintiff could continue to use the Doosan marks to advertise that it has Doosan equipment in its rental fleet and that it can service Doosan equipment. The issue here is whether plaintiff continued to use the Doosan marks to hold itself out as an authorized dealer after it no longer had a right to do so. There is no dispute that plaintiff continued to use the marks for this purpose after the 2014 Sales Agreement expired. But, there is also no dispute that it was the parties' practice to treat an expired agreement as operative while they negotiated a new contract. The parties attempted to reach an agreement as to a contract for 2015 through the first several months of 2015. It was not until May 15, 2015 that Doosan took the position that plaintiff was no longer an authorized Doosan dealer. Plaintiff has offered evidence that it stopped using the Doosan marks to hold itself out as an authorized by the end of June 2015. Defendant has offered no evidence to the contrary. Thus, plaintiff infringed defendant's marks for a period of approximately six weeks.

But that is not enough to entitle defendant to injunctive relief. In addition to establishing that plaintiff infringed its marks, defendant must come forward with some evidence that it suffered irreparable harm as a result of plaintiff's infringement. "[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991). Rather, in order to show irreparable harm, defendant must have some evidence of "loss of control over business reputation and damage to good will...." Herb Reed Enterprises, 736 F.3d at 1250. Seavert avers that plaintiff was an "unkempt dealership" and that this "was inconsistent with the image that [defendant] seeks to have associated with its trademark and network of authorized dealers."[80] But given that plaintiff's infringement was only for a period of approximately six weeks and during a time in which plaintiff apparently did not have any new Doosan equipment to sell, no reasonable fact finder could conclude that defendant suffered irreparable harm as a result of plaintiff's infringement. Thus, plaintiff's motion for summary judgment on defendant's trademark claims for injunctive relief is granted.

Plaintiff next argues that defendant cannot prove it was damaged by plaintiff's infringement. "Under 15 U.S.C. § 1117(a), the award of monetary remedies in trademark infringement cases includes an award of defendant's profits, any damages sustained by

---

[80]Seavert Affidavit at 30, ¶ 62, Docket No. 34.

plaintiff, and the costs of the action." Intel Corp. v. Terabyte Int'l, Inc., 6 F.3d 614, 620 (9th Cir. 1993). Plaintiff argues that it had no profits during the time it was allegedly infringing defendant's trademarks and offers evidence that it suffered $125,472.00 in losses for the six months ending June 30, 2015.[81] Defendant offers no evidence that plaintiff did in fact earn profits between May 15, 2015 and the end of June 2015. Defendant has offered evidence that it potentially lost $1.8 million because plaintiff was not a Doosan dealer in 2015.[82] It is possible that some of these losses were sustained between May 15, 2015 and the end of June 2015. Thus, plaintiff's motion for summary judgment on defendant's trademark claims for damages is denied.

Counterclaim Three: Unfair Trade Practices and Consumers Protection Act Claim

"As a general matter, a prima facie case of unfair or deceptive acts or practices under the UTPA requires proof of two elements: '(1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred.'" Kenai Chrysler Center, Inc. v. Denison, 167 P.3d 1240, 1255 (Alaska 2007) (quoting State v. O'Neill Investigations, Inc., 609 P.2d 520, 534 (Alaska 1980)). The only unfair act that defendant has alleged plaintiff committed is using defendant's trademarks after it no longer had a right to do so. As discussed above, defendant's trademark claims

---

[81]Heather Skaife Declaration [etc.] at 4, ¶ 12 and Exhibit A thereto, Docket No. 30.

[82]Seavert Declaration at 14, ¶ 25, Docket No. 34.

for damages survive plaintiff's motion for partial summary judgment. Thus, defendant's UTPA claim also survives.

Conclusion

Plaintiff's motion for partial summary judgment is granted in part and denied in part. Plaintiff's motion is granted as to the portion of its first claim for relief involving the stock attachments and shoe assembly track to that extent that this merchandise is "unused." It is granted as to defendant's contract claims in counterclaim Count One and defendant's trademark claims for injunctive relief in counterclaim Count Two. Plaintiff's motion is otherwise denied.

DATED at Anchorage, Alaska, this 6th day of May, 2016.

/s/ H. Russel Holland
United States District Judge